UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| EDILFREDO CHAVEZ, | Case No. 3:14-CV-00373-RCJ-CBC |
| Petitioner, | |
| v. | ORDER |
| RENEE BAKER, *et al.*, | |
| Respondents. | |

Introduction

   This case is a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by
Edilfredo Chavez, a Nevada prisoner. This case is before the Court for adjudication of the merits
of Chavez's remaining claims. The Court will deny Chavez's habeas petition, will deny him a
certificate of appealability, and will direct the Clerk of the Court to enter judgment accordingly.

Background

   On March 19, 2009, Chavez was convicted, and sentenced as follows, after a jury trial in
Nevada's Eighth Judicial District Court, for crimes committed against his wife's young half-
sister: Count 1, sexual assault with a minor under fourteen years of age, 420 months to life in
prison; Court 3, sexual assault with a minor under fourteen years of age, 420 months to life in
prison, consecutive to the sentence on Count 1; Count 4, sexual assault with a minor under
fourteen years of age, 420 months to life in prison, concurrent with the sentence on Count 3;
Count 11, statutory sexual seduction, 12 to 32 months in prison, concurrent with the sentence on
Count 4; Count 13, statutory sexual seduction, 12 to 32 months in prison, concurrent with the

1

sentence on Count 11; Count 15, statutory sexual seduction, 12 to 32 months in prison, concurrent with the sentence on Count 13; Count 16, lewdness with a child under the age of fourteen, 120 months to life in prison, concurrent with the sentence on Count 15; Count 19, lewdness with a child under the age of fourteen, 120 months to life in prison, concurrent with the sentence on Count 16; Count 20, use of a minor in producing pornography, 60 months to life in prison, concurrent with the sentence on Count 19; Count 21, use of a minor in producing pornography, 60 months to life in prison, concurrent with the sentence on Count 20; Count 22, possession of a visual presentation depicting sexual conduct of a child, 12 to 36 months in prison, concurrent with the sentence on Count 21; and Count 23, possession of a visual presentation depicting sexual conduct of a child, 12 to 36 months in prison, concurrent with the sentence on Count 22. *See* Judgment of Conviction (Jury Trial), Exhibit 39 (ECF No. 16-7). Chavez appealed, and the Nevada Supreme Court affirmed on May 12, 2011. *See* Order of Affirmance, Exhibit 45 (ECF No. 16-13).

On March 5, 2012, Chavez filed a petition for writ of habeas corpus in the state district court. *See* Petition for Writ of Habeas Corpus, Exhibit 48 (ECF No. 16-16). The State filed a response to the petition on April 19, 2012. *See* State's Response to Defendant's Pro Per Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 51 (ECF No. 17). Counsel was appointed for Chavez, and, with counsel, he filed supplemental points and authorities in support of his habeas petition on October 2, 2012. *See* Supplemental Points and Authorities in Support of Post-Conviction Writ, Exhibit 57 (ECF No. 17-6). The State filed a response to the supplemental petition on December 12, 2012. *See* State's Response to Defendant's Supplemental Points and Authorities in Support of Post-Conviction Writ, Exhibit 58 (ECF No. 17-7). The state district court held an evidentiary hearing on December 19, 2012. *See* Reporter's Transcript of Evidentiary Hearing, Exhibit 59 (ECF No. 18). The state district court denied the petition in a written order entered on February 7, 2013. *See* Findings of Fact, Conclusions of Law and Order, Exhibit 61 (ECF No. 18-2). Chavez appealed, and the Nevada Supreme Court affirmed on June 24, 2014. *See* Order of Affirmance, Exhibit 71 (ECF No. 19-4).

///

On July 17, 2014, this Court received Chavez's *pro se* federal petition for writ of habeas corpus. *See* Petition for A Writ of Habeas Corpus (ECF No. 4). The Court appointed counsel for Chavez. *See* Order entered July 31, 2014 (ECF No. 3). With counsel, Chavez filed a first amended habeas petition on December 23, 2014 (ECF No. 9). Chavez's amended petition included seven claims, designated Grounds 1, 2, 3A, 3B, 3C, 4A, and 4B.

On February 19, 2015, the Respondents filed a motion to dismiss, contending that Chavez's amended petition included claims not exhausted in state court. ECF No. 20. On May 7, 2015, Chavez filed an opposition to the motion to dismiss and a motion for stay, requesting a stay in this case while he exhausted claims in state court. ECF No. 22, 23. On June 5, 2015, the Respondents filed a reply to the opposition to the motion to dismiss and an opposition to the motion to stay. ECF No. 26, 27. On June 12, 2015, Chavez filed a reply to the opposition to the motion for stay. ECF No. 28. On June 16, 2015, Chavez filed a surreply in opposition to the motion to dismiss. ECF No. 31. On June 23, 2015, the Respondents filed a response to the surreply. ECF No. 32. On July 27, 2015, the Court ruled on those motions, granting the motion to dismiss in part and denying it in part, and granting the motion for stay. ECF No. 33. The Court determined that certain of the claims in Chavez's amended petition were unexhausted in state court, and stayed the action pending Chavez's further state-court proceedings. *Id.* at 12.

On September 14, 2015, Chavez initiated a second state habeas action. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 74 (ECF No. 40-1). The State filed a response and motion to dismiss on October 16, 2015. *See* State's Response and Motion to Dismiss Defendant's Post-Conviction Petition for Writ of Habeas Corpus, Exhibit 77 (ECF No. 40-4). The state district court denied that petition in a written order filed on December 21, 2015, ruling that the petition was barred by the state-law statute of limitations (NRS 34.726(1)) and rule regarding successive petitions (NRS 34.810(2)). *See* Findings of Fact, Conclusions of Law and Order, Exhibit 80 (ECF No. 40-7). Chavez appealed, and the Nevada Court of Appeals affirmed on August 17, 2016. *See* Order of Affirmance, Exhibit 86 (ECF No. 40-13).

///

///

On October 13, 2016, Chavez moved to lift the stay of this case, informing the Court that his further state-court proceedings had been completed. ECF No. 39. The Court granted that motion and lifted the stay on December 12, 2016. ECF No. 43.

On April 11, 2017, the Respondents filed a motion to dismiss. ECF No. 46. Chavez filed an opposition to the motion to dismiss on June 9, 2017. ECF No. 47. The Respondents replied on July 7, 2017. ECF No. 48. On January 29, 2018, the Court granted in part and denied in part the Respondents' motion to dismiss. ECF No. 50. Specifically, grounds 4A and 4B of the amended petition were dismissed as barred by the procedural default doctrine, and, in all other respects, the motion to dismiss was denied. *Id.* at 7.

The Respondents filed an answer to the remaining claims within the amended petition for writ of habeas corpus on April 30, 2018. ECF No. 51. Chavez filed a reply to the Respondents' answer on July 16, 2018. ECF No. 55. The Respondents filed a response to the reply on November 14, 2018. ECF No. 61.

Discussion

Standard of Review

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*,

538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

Ground 1

In Ground 1, Chavez claims that his federal constitutional rights were violated when his trial counsel failed to adequately advise him of the dangers of non-acceptance of the State's plea offer. First Amended Petition for Writ of Habeas Corpus (ECF No. 9) at 10. Chavez asserts that his counsel never explained to him that if he were convicted on all counts he could face a maximum sentence of 420 years to life and that a video depicting him and the victim engaging in sexual acts was enough evidence to convict him of two counts of lewdness with a child under the age of fourteen, two counts of use of a minor in producing pornography, and two counts of possession of visual presentation depicting sexual conduct of a child. *Id.* at 12. Chavez asserts that counsel failed to explain to him that the theory of defense—consent—was in fact an

admission to other offenses charged in the information. Reply to Respondents' Answer (ECF 55) at 12. The Respondents argue that the State's offer was communicated to Chavez, and that because Chavez rejected the offer, his counsel was not deficient. Answer to Remaining Claims Within Amended Petition for Writ of Habeas Corpus (ECF No. 51) at 9.

In the July 27, 2015, order, the Court found Ground 1 to be unexhausted in state court, so the Court stayed this action while Chavez exhausted this claim in state court. *See* Order filed July 27, 2015 (ECF No. 33) at 4, 12; *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petition who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."). Thereafter, Chavez filed a Post-Conviction Petition for Writ of Habeas Corpus, and the state district court denied the petition because it was procedurally barred and Chavez "fail[ed] to show good cause and prejudice." Findings of Fact, Conclusions of Law and Order, Exhibit 80 (ECF No. 40-7) at 4; *see Murray v. Carrier*, 477 U.S. 478, 496 (1986) (holding that where a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it). The Nevada Court of Appeals affirmed. *See* Order of Affirmance, Exhibit 86 (ECF No. 40-13). The Court lifted the stay in this action on December 12, 2016. *See* Order (ECF No. 43).

Chavez argues that ineffective assistance of counsel in his first state habeas action was cause for his procedural default of this claim. *See* Opposition to Motion to Dismiss (ECF No. 47). To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. "For cause to exist, the external impediment . . . must have prevented [the] petitioner from raising the claim." *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). "To establish prejudice resulting from a procedural default, a habeas petitioner bears 'the burden of showing not merely that the errors [complained of] constituted a *possibility* of

prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (emphases in original), citing *United States v. Frady*, 456 U.S. 152, 170 (1982).

In *Martinez v. Ryan*, the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause, to overcome the procedural default of a claim of ineffective assistance of trial counsel. 566 U.S. 1 (2012). In *Martinez*, the Supreme Court noted that it had previously held, in *Coleman*, that "an attorney's negligence in a postconviction proceeding does not establish cause" to excuse a procedural default. *Id.* at 1319. The *Martinez* Court, however, "qualif[ied] *Coleman* by recognizing a narrow exception: [i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 1315. The Court described "initial- review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance of trial." *Id.*

In the January 29, 2018, order, the Court found that Chavez's argument that his counsel for his first state habeas action was ineffective was cause for his procedural default of this claim, raised the question of the merits of Ground 1, and that, as a result, the matter of the procedural default of this ground would be better addressed after the Respondents filed an answer, and Chavez a reply. *See* Order filed January 29, 2018 (ECF No. 50) at 5-6. The Court now determines that Chavez's post-conviction counsel was not ineffective for not asserting this claim, and that, at any rate, the claim is not substantial, and is without merit, because Chavez does not show that his trial counsel was deficient.

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See Strickland*, 466 U.S. at 697.

A defendant's right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). When the ineffective assistance of counsel claim is based "[i]n the context of pleas[,] a defendant must show the outcome of the plea process would have been different with competent advise." *Id.* at 163. In other words, "prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.* at 168.

At the post-conviction evidentiary hearing, Chavez's trial counsel, Mr. Jeff Maningo (hereinafter Maningo), testified that "[t]here was a five-to-life offer" on a manufacturing child pornography charge that was "repeatedly" communicated to Chavez. Reporter's Transcript of Evidentiary Hearing, Exhibit 59 (ECF 18) at 5, 7; *see also* Guilty Plea Agreement, Exhibit 60 (ECF 18-1). Maningo testified that he "really wanted [Chavez] to accept the offer." Reporter's Transcript of Evidentiary Hearing, Exhibit 59 (ECF 18) at 7. Maningo explained that

> when you have a case where your client is actually on videotape having sexual relations with someone who's under age [sic], consensual or not, that's not a fun time in front of a jury. And we expressed that to him numerous times that this jury's gonna look at this video and they're, they're not gonna be happy with you. Whether they see that it's consensual or not, they're not gonna be pleased, it's not a good case for trial, this is an offer where you're gonna be exposed to a lot less time.

*Id.*

Chavez testified at the post-conviction hearing that Maningo "just told [him] to sign five to life, that it would be a good deal." *Id.* at 20. Maningo showed Chavez the guilty plea agreement, which was only written in English, a language that Chavez does not understand. *Id.*

Chavez explained that he had already been in jail for two years at the time the offer was discussed, that Maningo "thought [he] probably would be out in about three years" and that because Maningo "couldn't guarantee [Chavez] that [he] would only do one more year in prison," Chavez elected to go to trial. *Id.* at 22. Chavez also explained that "an inmate told [him] that if [he] saw something that was five to life . . . not to sign it." *Id.*

Chavez argues that Maningo failed to adequately advise him of the dangers of not accepting the plea offer. However, Maningo's testimony at the post-conviction hearing refutes that argument. Maningo testified that he "repeatedly" communicated to Chavez that this was a good offer. Reporter's Transcript of Evidentiary Hearing, Exhibit 59 (ECF 18) at 7. Indeed, Maningo explained that he expressed to Chavez "over and over" that "this is an offer where you're gonna be exposed to a lot less time." *Id.* Rather than taking the advice of his counsel, it appears that Chavez instead chose to listen to the advice of a fellow inmate. *Id.* at 22. Accordingly, because Maningo informed Chavez about the plea on a repeated basis and expressed the fact that his sentence would be much less if he accepted the offer, it cannot be determined that Maningo's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 694; *see also Missouri v. Frye*, 566 U.S. 134, 145 (2012) ("[D]efense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."). Moreover, because Chavez refused at the time to consider the State's offer, he has failed to demonstrate a reasonable probability that he would have timely accepted the State's offer. *See Jones v. Wood*, 114 F.3d 1002, 1012 (9th Cir. 1997) (finding no prejudice where there was no "reasonable probability that at the time of the offer" the petitioner would have accepted the government's plea offer).

Because Chavez has not shown this claim of ineffective assistance of counsel regarding Maningo's failure to adequately inform him of the dangers of not accepting the plea offer to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Chavez's post-conviction counsel was not ineffective, there is no cause for Chavez's procedural default. *See Martinez*, 566 U.S. at 9 ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a

claim of ineffective assistance at trial."). Therefore, Ground 1 will be denied on the ground that it is procedurally defaulted.

<u>Ground 2</u>

In Ground 2, Chavez claims that his federal constitutional rights were violated based on the State's use of peremptory challenges in a racially discriminatory manner. First Amended Petition for Writ of Habeas Corpus (ECF No. 9) at 12. Specifically, Chavez argues that the State used three of its peremptory challenges to strike African-American jurors—Carl Jones, Willie Daniels, and Bass Davis—and that the prosecution's explanations for challenging these jurors were a pretext for discrimination. *Id.* at 17. The Respondents assert that the veniremen identified by Chavez were excused for race-neutral reasons. Answer to Remaining Claims Within Amended Petition for Writ of Habeas Corpus (ECF No. 51) at 10.

This ground was raised in Chavez's direct appeal. (*See* Appellant's Opening Brief, Exhibit 42 (ECF No. 16-10) at 10 ("The State's exclusion of three African-Americans from the jury violated equal protection and due process guarantees of the United States and Nevada Constitutions."). The Nevada Supreme Court held that "the record supports the district court's determination" that "the State's removal of the challenged jurors was not based on a systematic exclusion of any particular race." Order of Affirmance, Exhibit 45 (ECF 16-13) at 2-3. The Court finds that the ruling of the Nevada Supreme Court was reasonable.

The use of a peremptory challenge to remove a prospective juror because of race violates the federal constitution. *See J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 129 (1994); *Powers v. Ohio*, 499 U.S. 400, 409 (1991). Under *Batson v. Kentucky*, 476 U.S. 79 (1986) and its progeny, consideration of a defendant's challenge to a peremptory strike involves a three-step analysis:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecution to present a race-neutral explanation for striking the juror in question. . . . Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.

*Rice v. Collins*, 546 U.S. 333, 338 (2006).

///

10

The trial court's determination regarding intentional discrimination is a question of fact. *See Flowers v. Mississippi*, 136 S.Ct. 2157, 2158 (2016); *Hernandez v. New York*, 500 U.S. 352, 364 (1991). Therefore, a habeas petitioner is entitled to relief on a *Batson* claim only if the state court's denial of the claim constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Rice*, 546 U.S. at 338. Thus, this Court can grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338. Moreover, under 28 U.S.C. § 2254(e)(1), "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* at 338-39. Although "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42.

Carl Jones, a prospective juror at Chavez's trial, indicated that his "stepson is currently going through child custody issue[s] with his wife" and his wife "has accused him of molesting his daughter," who is four years old. Reporter's Transcript of Jury Trial, Exhibit 28, Part 1 (ECF No. 12-1) at 22, 25. The following colloquy occurred between the court and Jones:

> THE COURT: And am I correct in my assumption that you really don't know any more about that situation than you've just heard through, I guess, reports from people, but you have no personal knowledge of any thing?
>
> PROSPECTIVE JUROR JONES: No personal knowledge. And it didn't develop or come out until after they moved from Las Vegas to Kansas City, which was two years ago.
>
> THE COURT: Now, the behavior that is objected to, is that something that allegedly occurred in Las Vegas, or Kansas City?
>
> PROSPECTIVE JUROR JONES: Well, from Kansas City, the story has it that it started here, but she never complained or said anything. And they intended to get married, move to Kansas City. After they got to Kansas City, then she kicked him out and filed the charges against him.
>
> THE COURT: So they were never married?
>
> PROSPECTIVE JUROR JONES: No.

11

THE COURT: And answer this yes or no, if you would. Do you have sense as to whether or not your stepson is being treated fairly.

PROSPECTIVE JUROR JONES: I know he's not.

THE COURT: Now, given that, do you think that that sort of concern might carry over to this trial?

PROSPECTIVE JUROR JONES: I wouldn't think so.

THE COURT: Do you think you can maintain the separateness of the alleged events?

PROSPECTIVE JUROR JONES: Yes.

. . .

MS. CLARKE: Thank you. Sir, despite the situation that you have with your stepson, if you were the State, you would still feel comfortable having someone like yourself on this jury?

PROSPECTIVE JUROR JONES: Yes.

MS. CLARKE: Now, you said that she filed charges. She filed charges here in Las Vegas?

PROSPECTIVE JUROR JONES: No, no.

MS. CLARKE: so even though the behavior was supposed to have started here, it's just being dealt with back there in Kansas City?

PROSPECTIVE JUROR JONES: Correct.

MS. CLARKE: And other than I think what the Judge asked you your involvement in it, were you present at least in the four-year-old's life when the alleged acts were to have occurred?

PROSPECTIVE JUROR JONES: Only when she was one, one-and-a-half, almost two. That was about the time that they packed up and left. Then they had the twins after they reached Kansas City.

MS. CLARKE: What is it about the way your stepson is being treated that you think is unfair?

PROSPECTIVE JUROR JONES: Nobody knew anything all of the years that they were here, and nobody had a clue. She never said a word, never brought up anything that's going on.

He packs up and moves to Kansas City, and within the first - - after being engaged he proposes, she says yes, 30 days later she kicks him out, and then these charges come up.

MS. CLARKE: So one of the main reasons is because the little girl didn't say something sooner?

PROSPECTIVE JUROR JONES: No. It was that she never said anything, or no one said anything.

MS. CLARKE: She, being the little girl?

PROSPECTIVE JUROR JONES: The mother or the daughter.

. . .

MS. CLARKE: So it's nothing about the criminal justice system that bothers you, or you think your stepson is being treated unfairly?

PROSPECTIVE JUROR JONES: No.

MS. CLARKE: It's just the accusations in and of themselves?

PROSPECTIVE JUROR JONES: Right; his fiancée.

MS. CLARKE: And you obviously know the nature of the charges in this case?

PROSPECTIVE JUROR JONES: Yes.

MS. CLARKE: Do you still think you'd be able to sit here and be fair, despite knowing that your stepson is being unfairly treated?

PROSPECTIVE JUROR JONES: I believe so, yes.

. . .

THE COURT: Let me clarify something, Mr. Jones, in my own mind here. I had the sense earlier on when you first mentioned the situation, that you felt that the mother of the children engaged in a custody battle, was using this to somehow acquire advantage over the father by virtue of these accusations?

PROSPECTIVE JUROR JONES: One hundred percent, yes.

THE COURT: All right. Recognizing that fact, in all fairness, you can't really say whether there's any validity to the charges or not. They just are suspect because of the timing and the advantage they give the mother? Is that fair to say?

13

PROSPECTIVE JUROR JONES: Correct.

THE COURT: Just so I understand.

The State's third peremptory challenge?

MS. CLARKE: thank you. The State would thank [and] excuse Juror No. 280, Mr. Carl Jones.

*Id.* at 25-27, 30-33.

The State explained its challenge of Jones as follows:

[T]he State questioned him extensively on the fact that his stepson was accused of a sexual crime; not just a sexual crime, but a sexual crime involving a four-year old little girl, his daughter.

He said that his stepson was treated unfairly and the State is concerned about that, given the fact that we have a female victim in this case. When the State further questioned him about why he didn't believe the accusations were true, basically, he just said, well, it was an accusation and it took a long time and nobody said anything.

This is a case where we have a few years go by before this disclosure so, certainly, it is the State's concern that the fact there was a delayed disclosure might systematically have him say: Well, I think he's not guilty then, Judge. So that's the race-neutral reason for him.

Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 56.

Next, the State used its fifth peremptory challenge on Willie Daniels. Reporter's Transcript of Jury Trial, Exhibit 28, Part 1 (ECF No. 12-1) at 63. The State explained that it challenged Daniels because it "did not want any young males on our jury; specifically, between the ages of 18 and 25." Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 57. The State further explained the following:

It's the State's position that perhaps younger males may be more inclined to watch pornography, or be involved in it, or at least have a closer connection with it in the sense that they may be in college, or just getting of college, et cetera. We did not want that to be an issue in this case, and that's why we let Mr. Daniels go.

*Id.*

The State then used its seventh peremptory challenge on Bass Davis. *Id.* at 19. The State explained that it challenged Davis because

14

when [Davis] was asked to sit in this seat off to the left, Tom, your Bailiff, told him to sit in a particular seat. He didn't follow direction. He had to be told to get up and move seats. He didn't follow direction. . . . However, additionally, Mr. Davis sat here today, the State noticed, for one hour and 20 minutes straight with his arms folded and did not move his arms. Additionally, yesterday he had his arms folded during primarily all the procedures. Yesterday as well he had his eyes closed, and it's the State's belief that he was falling asleep. I would certainly want attentive jurors who are active participants, or at least actively listeners [sic] in our case.

*Id.* at 58.

The district court ruled that it did not "see any improper motivation, or any systemic exclusion of any particular class or race or group of peers that would rise to a Batson challenge." *Id.* at 62.

Turning first to Jones, the State explained that it challenged him due to the allegations of molestation made against his stepson and Jones' belief that his stepson was being treated unfairly. Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 56. This explanation is supported by Jones' statements during voir dire. *See* Reporter's Transcript of Jury Trial, Exhibit 28, Part 1 (ECF No. 12-1) at 25-27, 30-33. In fact, the molestation allegations made against Jones' stepson were similar to the case at hand in that both victims did not immediately come forward following the abuse. Although Jones stated that he would be a fair juror and be able to keep the events regarding his stepson separate from the events of the trial, it was reasonable for the State to have had concerns about Jones being on the jury, especially regarding his beliefs that the alleged perpetrator, his stepson, was being treated unfairly. Indeed, Jones insinuated that the allegations of molestation regarding his stepson were not believable because they were not brought up sooner. Therefore, the Court cannot say that the trial court's acceptance of the prosecutor's race-neutral explanations regarding Jones was unreasonable. *Rice*, 546 U.S. at 338.

Turning to Daniels, the State explained that it challenged him because he was a young male who may be more inclined to watch pornography. Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 57. The State's explanation is mildly unconvincing, as its theory that young men may be more inclined to watch pornography was unsupported and

conclusory. The State also failed to explain how an inclination to watch pornography would impact a prospective juror's interpretation of the facts in this case. However, "disagree[ing] about the prosecutor's credibility" is not sufficient to overcome "the trial court's credibility determination." *Rice*, 546 U.S. at 341-42. The district court ruled that it did not "see any improper motivation." Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 62. Accordingly, as "[s]tate-court factual findings . . . are presumed correct" and Chavez has failed to rebut the trial court's ruling by clear and convincing evidence, the Court cannot say that the trial court's acceptance of the State's race-neutral explanations regarding Daniels was unreasonable. *Rice*, 546 U.S. at 338-39.

Turning finally to Davis, the State explained that it challenged him because he was unable to follow instructions, sat with his arms folded, and had his eyes closed during a portion of the proceedings. Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 58. Because an inattentive juror is a legitimate concern unrelated to race, the Court cannot say that the trial court's acceptance of the prosecutor's race-neutral explanations regarding Davis was unreasonable. *Rice*, 546 U.S. at 338.

Accordingly, because Jones' opinions about molestation plausibility, Daniel's alleged propensity for viewing pornography, and Davis' apathetic behaviors are all unrelated to race and could have caused genuine concern for the State, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Chavez habeas corpus relief with respect to Ground 2.

Ground 3A

In Ground 3A, Chavez claims that his federal constitutional rights were violated when Maningo failed to argue that the State had impermissibly exercised its peremptory challenges in a discriminatory manner on the basis of gender. First Amended Petition for Writ of Habeas Corpus (ECF No. 9) at 19. Chavez explains that had Maningo raised such an objection, it would have been sustained and at least one juror who the defense wanted to sit on the jury, Daniels,

would have been seated. *Id.* at 20-21. The Respondents argue that Maningo did make an argument about gender-based peremptory challenges at the close of voir dire. Answer to Remaining Claims Within Amended Petition for Writ of Habeas Corpus (ECF No. 51) at 11. Chavez clarifies that Maningo objected under a general due process theory to the State's use of peremptory challenges to exclude males, but Maningo did not specifically argue that striking young males constituted impermissible gender discrimination. Reply to Respondents' Answer (ECF No. 55) at 25.

This ground was raised on the appeal in Chavez's state habeas appeal. *See* Appellant's Opening Brief, Ex. 66 (ECF No. 18-7) at 47 ("Trial counsel failed to make a *Batson* challenge when the state announced that they intended to deplete the jury venireman of young males."). The Nevada Supreme Court held that Chavez

> fails to demonstrate deficiency for this claim as counsel challenged the dismissal of these jurors based on their gender and the district court denied that challenge. [Chavez] fails to demonstrate a reasonable probability of a different outcome had counsel made further arguments regarding the dismissal of these jurors. Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 71 (ECF No. 19-4) at 11. The Court finds that the ruling of the Nevada Supreme Court was reasonable.

As recognized previously, in explaining why it challenged an African-American juror, Willie Daniels, the State explained that it "did not want any young males on our jury; specifically, between the ages of 18 and 25" because "this case involves pornography[, and i]t's the State's position that perhaps younger males may be more inclined to watch pornography, or be involved in it, or at least have a closer connection with it in the sense that they may be in college, or just getting out of college." Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 135. The State pointed out that it mistakenly believed that Chavez was "excluding young males *as well.*" *Id.* (emphasis added). The State also indicated it "didn't want any younger males because of the pornography. Certainly, Judge, that's not a systematic exclusion of any particular group. It wasn't just males, and it wasn't just young people, it was both combined." *Id.* at 137. In addition to Daniels, the State "also excluded [Christopher] Ward,

who was a young male." *Id.* at 135. In response, Maningo argued that "the State had stated that their policy was to exclude males 18 to 25, and we would argue that that policy in itself violates due process." *Id.* at 136.

Gender-based peremptory challenges violate the Fourteenth Amendment. *J.E.B. v. Alabama*, 511 U.S. 127, 130-31 (1994) ("All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination."). As was explained previously, "[t]he standards for assessing a prima facie case in the context of discriminatory selection of the venire" are as follows: the defendant must "establish a prima facie case of purposeful discrimination," then the State must "come forward with a neutral explanation for [the] challeng[e]," and then "[t]he trial court . . . will have the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 96-98; *see also J.E.B.*, 511 U.S. at 144-45.

The issue here is whether Maningo's argument that "the State had stated that their policy was to exclude males 18 to 25, and we would argue that that policy in itself violates due process," Reporter's Transcript of Jury Trial, Exhibit 28, Part 2 (ECF No. 12-2) at 136, amounts to making "a prima facie case of purposeful discrimination." *Batson*, 476 U.S. at 96. Although Maningo could have articulated his argument more artfully by citing *J.E.B.* and arguing more specifically that striking young males constituted impermissible gender discrimination, Maningo did contest the State's dismissal of young men. "A prima facie case under *Batson* requires only that the objecting party show 'that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Carrera v. Ayers*, 699 F.3d 1104, 1110 (9th Cir. 2012) (citing *Batson*, 476 U.S. at 93-94) (emphasis omitted); *see also Johnson v. California*, 545 U.S. 162, 170 (2005) ("[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.").

Maningo brought the necessary facts to the trial court's attention: the State was utilizing a policy of excluding young men. By highlighting this exclusion policy, Maningo directed the trial court's attention to the implication that the State was improperly discriminating. This satisfies

the first step articulated in *Batson* for challenging a peremptory challenge. Accordingly, it cannot be determined that Maningo's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 694. Thus, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Chavez habeas corpus relief with respect to Ground 3A.

Ground 3B

In Ground 3B, Chavez claims that his federal constitutional rights were violated due to Maningo's failure to object when the State argued that the victim could not consent due to her age. First Amended Petition for Writ of Habeas Corpus (ECF No. 9) at 21. Chavez explains that age is only relevant and becomes an element in a sexual assault case when determining the sentence one receives if found guilty. *Id.* at 22. Chavez explained that he was prejudiced by Maningo's lack of an objection because the State was relieved of proving beyond a reasonable doubt that the victim did not consent to the sexual encounters with Chavez. *Id.* The Respondents argue that the State never made this argument at trial. Answer to Remaining Claims Within Amended Petition for Writ of Habeas Corpus (ECF No. 51) at 11.

This ground was raised on the appeal in Chavez's state habeas appeal. *See* Appellant's Opening Brief, Ex. 66 (ECF No. 18-7) at 47 ("[T]he fact of whether or not the victim consented is removed from the jury's consideration by the fact that they are instructed that the age of the victim prevents her from giving legal consent."). The Nevada Supreme Court held that Chavez

> fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. The State did not argue that the victim could not consent; rather it properly argued that the victim's characteristics, including her age, demonstrated that she did not legally consent to the sexual activity. [Chavez] fails to demonstrate a reasonable probability of a different outcome had counsel objected. Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 71 (ECF No. 19-4) at 7-8 (internal citation omitted). The Court finds that the ruling of the Nevada Supreme Court was reasonable.

///

The State made several arguments regarding consent during its closing argument. *See* Reporter's Transcript of Jury Trial, Exhibit 31 Part 2 (ECF 15-1), Exhibit 31 Part 3 (ECF 15-2). First, the State asked, "[i]s a 12-year old capable of giving consent?" Reporter's Transcript of Jury Trial, Exhibit 31 Part 2 (ECF 15-1) at 14. Second, the State argued that:

> She's a child. When the defendant started abusing her she was 12 years old. Is she mentally capable of understanding the nature of the defendant's conduct? Understanding the nature of what it means to: Hey, take off your pants and get on the bed? No, she's not.

> A person is not required to do more than her age, strength, surrounding facts and attending circumstances to make it reasonable for her to do, to manifest opposition to a sexual assault.

> But she did. Didn't she try to fight him off? The first time she struggled with him. The second time she's pushing him. The third time he slapped her across the face. And, finally, she said: you know what, I'm done fighting because he's going to do it anyway. She told you that. He was going to do it anyway, and at some point isn't it easier to just give up.

> But that doesn't mean that it was with her consent, even if you find that she had the mental capacity to consent based on her age.

*Id.* at 16. Finally, the State argued that:

> The reason why that's important is, I mentioned the lewdness with a minor being an alternative count. If you find that she consented, or if you find she had the mentally [sic] capacity to consent and did, if you believe that her hand touched his penis during this time, then he's guilty of lewdness with a minor for having her touch his penis with her hands.

> Because, again remember consent is not a defense to lewdness. It is, however, a defense to sexual assault. So that's where the lewdness alternative count comes in. You remember [the victim] testified that she didn't struggle. She said he had his way three times before, he'll end up doing it again.

*Id.* at 22.

The State is prohibited from using burden-shifting or conclusive presumptions that relieve the State of its burden of proving every element beyond a reasonable doubt. *Sandstrom v. Montana*, 442 US 510, 520-24 (1979). In Nevada, "an alleged perpetrator's knowledge of lack of consent is an element of sexual assault." *Carter v. State*, 121 Nev. 759, 766, 121 P.3d 592, 596 (2005). Accordingly, the issue is whether the State's foregoing statements amount to a

20

presumption that a victim cannot consent, thereby improperly relieving the State of his burden to prove that the victim did not consent.

Although the State did not explicitly state that the victim was incapable of giving consent because of her age, the State did tread close to closing that line. The follow statements imply, in some capacity, that the victim could not consent: (1) "[i]s a 12-year old capable of giving consent"; (2) "if you find that she had the mental capacity to consent based on her age"; and (3) "if you find she had the mentally [sic] capacity to consent." Reporter's Transcript of Jury Trial, Exhibit 31, Part 2 (ECF No. 15-1) at 14, 16, 22.

However, even if Maningo's failure to object to these statements amounts to "representation [that] fell below an objective standard of reasonableness," Chavez must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. Following these potentially improper statements, the State clarified that "consent is . . . a defense to sexual assault." Reporter's Transcript of Jury Trial, Exhibit 31, Part 2 (ECF No. 15-1) at 22. Moreover, Maningo took the opportunity several times in his closing argument to stress to the jury that consent is a defense to sexual assault. Reporter's Transcript of Jury Trial, Exhibit 31, Part 3 (ECF No. 15-2) at 6-7 ("consent is a defense" to sexual assault); at 13 ("You'll see the consent instruction. It explains that consent is a defense to sexual assault."); at 14 ("You may not agree that a 14 [year old] should be allowed to consent, but that is the defense in this case. And so now you have to look at whether or not you think it was consensual. Now, consent for someone who is 14 years of age, that can be a difficult concept, admittedly. But we can't be so naïve as to think that teenagers do not make their own decision."). Therefore, even though the State may have made some questionable statements regarding consent, the clarifying remarks by Maningo and the State regarding consent do not support a finding that but for Maningo's failure to object, the result of Chavez's trial would have been different. *Strickland*, 466 U.S. at 694. Thus, the Nevada Supreme Court's ruling that there was no prejudice was not contrary to, or unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence.

*See* 28 U.S.C. § 2254(d). The Court will deny Chavez habeas corpus relief with respect to Ground 3B.

Ground 3C

In Ground 3C, Chavez claims that his federal constitutional rights were violated when Maningo failed to conduct an adequate investigation. First Amended Petition for Writ of Habeas Corpus (ECF No. 9) at 23. Specifically, Chavez argues that he wanted Maningo to call Carla Menjivar, Alma Pattarroyo and Wendy Linares, but instead, he only called Menjivar. *Id.* Chavez also argues that Pattarroyo's testimony was critical in establishing the defense that the victim fabricated the sexual assaults and that the victim went after Chavez. *Id.* at 24. The Respondents argue that it was a strategic decision to call Menjivar instead of Pattarroyo and Linares. Answer to Remaining Claims Within Amended Petition for Writ of Habeas Corpus (ECF No. 51) at 13.

Chavez made such a claim on the appeal in his state habeas action with respect to Maningo's alleged failure to investigate and call Alma Pattarroyo. *See* Appellant's Opening Brief, Exhibit 66 (ECF No. 18-7) at 1. Accordingly, this portion of Ground 3C has been exhausted. The Nevada Supreme Court held that Chavez

> fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Counsel testified at the evidentiary hearing that his investigator interviewed [Pattarroyo] and that counsel did not want to call her as a witness because she and [Chavez] had had a sexual relationship. [Chavez] fails to demonstrate that reasonably diligent counsel would have personally interviewed [Pattarroyo] or that there was a reasonable probability of a different outcome at trial had counsel personally interviewed [Pattarroyo]. Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 71 (ECF No. 19-4) at 4. As will be discussed, the Court finds that this ruling of the Nevada Supreme Court was reasonable.

However, Chavez did not, on the appeal in his state habeas action, claim that Maningo was ineffective for failing to adequately investigate Wendy Linares. *See* Appellant's Opening Brief, Exhibit 66 (ECF No. 18-7). Therefore, in the July 27, 2015, order, the Court found this portion of Ground 3C to be unexhausted in state court. *See* Order filed July 27, 2015 (ECF No. 33) at 6. The Court stayed this action while Chavez exhausted this portion of this claim in state

court. *Id.* at 12. Thereafter, Chavez filed a Post-Conviction Petition for Writ of Habeas Corpus, and the state district court denied the petition because it was procedurally barred and Chavez "fail[ed] to show good cause and prejudice." Findings of Fact, Conclusions of Law and Order, Exhibit 80 (ECF No. 40-7) at 4. The Nevada Court of Appeals affirmed. *See* Order of Affirmance, Exhibit 86 (ECF No. 40-13). The Court lifted the stay in this action on December 12, 2016. *See* Order (ECF No. 43).

Chavez argues that ineffective assistance of counsel in his first state habeas action was cause for his procedural default of this portion of this claim. *See* Opposition to Motion to Dismiss (ECF No. 47). In the January 29, 2018, order, the Court found that Chavez's argument, which is based on *Martinez v. Ryan*, 566 U.S. 1 (2012), raised the question of the merits of this portion of Ground 3C, and that, as a result, the matter of the procedural default of this ground would be better addressed after the Respondents filed an answer, and Chavez a reply. *See* Order filed January 29, 2018 (ECF No. 50) at 5-6. The Court now determines that Chavez's post-conviction counsel was not ineffective for not asserting this claim, and that, at any rate, the claim is not substantial, and is without merit, because Chavez does not show that Maningo was deficient.

Pattarroyo and Linares were on Chavez's witness list prior to trial. *See* Defendant's Notice of Witnesses, Exhibit 21 (ECF No. 11-10); Defendant's Notice of Witnesses, Exhibit 22 (ECF No. 11-11). However, neither of these witnesses were called to testify. Instead, Carla Menjivar, Chavez's wife, was the only witness to testify for Chavez at his trial. *See* Reporter's Transcript of Jury Trial, Exhibit 31, Part 1 (ECF No. 15) at 40. Menjivar testified that the victim, her half-sister, would "follow [Chavez] around a lot," would try to massage Chavez's shoulders, would flirt with Chavez, and would call him a lot. *Id.* at 42-43, 46. Menjivar also testified that the victim never appeared afraid of Chavez, never told her she was afraid of Chavez, never told her anything inappropriate was going on with Chavez, and never heard the victim screaming or crying out for help. *Id.* at 42-43. Menjivar testified that the victim "lies a lot." *Id.* at 44.

At the post-conviction evidentiary hearing, Maningo testified that Chavez wanted him to call Pattarroyo and Linares. Reporter's Transcript of Evidentiary Hearing, Exhibit 59 (ECF 18)

at 5, 9. Although Maningo's investigator interviewed Pattarroyo and Linares, Maningo explained that he did not call Pattarroyo or Linares because "Carla [Menjivar] was the witness who actually saw how her sister [the victim] acted and, and knew her sister's character" whereas "[t]he other two were essentially witnesses that received their information from Carla." *Id.* at 9, 12. Therefore, Maningo believed there would be hearsay issues with regard to Pattarroyo's and Linares' testimonies. *Id.* at 12. Maningo also explained that he also did not want to call Pattarroyo because Chavez "had had sex with her." *Id.* at 13; *see also* Reporter's Transcript of Jury Trial, Exhibit 29 Part 1 (ECF 13) at 62-63 (testimony of the victim that she walked in on Chavez and her mother, Pattarroyo on the bathroom floor). Finally, Maningo explained that he was able to get out his theories of defense—consent and the victim's lack of credibility—through Menjivar's testimony and that there was "[n]othing more based on [his and his investigator's] investigation" of Pattarroyo or Linares that could have added to the trial. Reporter's Transcript of Evidentiary Hearing, Exhibit 59 (ECF 18) at 13, 17.

Chavez testified at the post-conviction hearing that he wanted Pattarroyo and Linares to testify because "[t]hey knew the lifestyle that the [victim] was living." *Id.* at 21. Specifically, with regard to Pattarroyo, the victim's mother, he wished to have her "testify because she had more to say about" the victim than Menjivar, the victim's half-sister, did. *Id.*

Although it is unclear what Linares' testimony would have been, Pattarroyo signed a declaration explaining what her testimony would have been.[1] *See* Declaration of Alma Emely Pattarroyo, Exhibit 73 (ECF No. 19-6). Pattarroyo declared that the victim was never alone when

---

[1] This declaration was not submitted in Chavez's first state petition for writ of habeas corpus. In its order denying in part and granting in part the motion to dismiss and granting the motion for stay, the Court indicated that the declaration was inadmissible in this federal habeas action. *See* Order filed July 27, 2015 (ECF No. 33) at 6 n.4 (citing *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.")). Chavez presented this declaration before the state court when he filed his second petition, but that petition was ruled procedurally barred in state court. *See* Index of Exhibits in Support of Petition for Writ of Habeas Corpus, Exhibit 75 (ECF No. 40-2); Findings of Fact, Conclusions of Law and Order, Exhibit 80 (ECF No. 40-7) at 4. However, whether the Court considers the impact of this declaration under a *Martinez* analysis or refuses to consider it and analyzes this claim under 28 U.S.C. § 2254(d), the court finds the outcome the same: Maningo was not deficient.

she visited Chavez's home, the victim flirted heavily with Chavez, and, on one occasion, she heard noises from the victim's room and heard someone, who she believed to be Chavez, exit through an exterior door of the victim's room. *Id.* at 2-4. Contrary to Maningo's testimony given at the post-conviction hearing, Pattarroyo also declared that she was never "interviewed by any individual and/or member of a defense team, with regard to Edilfredo Chavez's case, until [she] was interviewed by the Federal Public Defender's Officer, District of Nevada." *Id.* at 4.

Although Chavez argues that Pattarroyo's and Linares' testimonies were necessary to establish his defense that the victim fabricated the sexual assaults, that argument is belied by the record. In fact, Menjivar's testimony spoke directly to Chavez's defense: Menjivar established that the victim had an affinity for Chavez and that her opinion was that the victim was not truthful. *See* Reporter's Transcript of Jury Trial, Exhibit 31, Part 1 (ECF No. 15) at 43-45. Accordingly, Pattarroyo's and Linares' testimonies would have been cumulative. *See United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990) ("The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record."). Moreover, Maningo's explanation that he did not call Pattarroyo to testify because she had had sexual relations with Chavez demonstrates that his decision was a tactical one. *See Minner v. Kerby*, 30 F.3d 1311, 1317 (10th Cir. 1994) ("[T]he decision of what witnesses to call is a tactical one within the trial counsel's discretion."); *cf. Strickland*, 466 U.S. at 691 (1984) ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). Additionally, it is unclear what additional "lifestyle" evidence of the victim Chavez believed would have been provided by Linares or Pattarroyo. *See* Reporter's Transcript of Evidentiary Hearing, Exhibit 59 (ECF 18) at 21. It is also unclear how the victim's "lifestyle" would have provided evidence showing that she was untruthful. Therefore, it cannot be determined that Maningo's "representation fell below an objective standard of reasonableness" when he failed to call Pattarroyo and Linares to testify. *Strickland*, 466 U.S. at 694.

Because Chavez has not shown this claim of ineffective assistance of counsel regarding Maningo's failure to call Linares to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Chavez's post-conviction counsel was not ineffective, there is no cause for Chavez's procedural default. *See Martinez*, 566 U.S. at 9 ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."). Therefore, this portion of Ground 3C—the failure to call Linares to testify—will be denied on the ground that it is procedurally defaulted.

Turning to the remainder of Ground 3C—the failure to call Pattarroyo to testify— because Maningo's was not deficient, the Nevada Supreme Court's ruling that there was no deficiency or prejudice, *see* Order of Affirmance, Exhibit 71 (ECF No. 19-4) at 4, was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). Therefore, Chavez will be denied habeas corpus relief regarding the remainder of Ground 3C.

Certificate of Appealability

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

Applying this standard, the Court finds that a certificate of appealability is unwarranted in this case. The Court will deny Chavez a certificate of appealability.

///

///

Conclusion

It is therefore ordered that the First Amended Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (ECF No. 9) is denied.

It is further ordered that Petitioner is denied a certificate of appealability.

It is further ordered that, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is directed to substitute Renee Baker for Robert LeGrand as the Respondent warden on the docket for his case.

It is further ordered that the Clerk of the Court is directed to enter judgment accordingly.

DATED: This 12th day of September, 2019.

_____
UNITED STATES DISTRICT JUDGE